# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

BONNIE BUTLER

        **Plaintiff,**                   **CIVIL ACTION NO. 06-CV-13424-DT**

        vs.                               **DISTRICT JUDGE BERNARD A. FRIEDMAN**

**COMMISSIONER OF**                    **MAGISTRATE JUDGE MONA K. MAJZOUB**
**SOCIAL SECURITY,**

        **Defendant.**
_____/

## REPORT AND RECOMMENDATION

## I. RECOMMENDATION

This Court recommends that Defendant's Motion for Summary Judgment be **GRANTED** (Docket # 11), that Plaintiff's Motion for Summary Judgment be **DENIED** (Docket # 10), and that Plaintiff's complaint be **DISMISSED**.

## II. PROCEDURAL HISTORY

This is an action for judicial review of the final decision by the Commissioner of Social Security that Plaintiff was not "disabled" for purposes of the Social Security Act. 42 U.S.C. §§ 423, 1382. The issue for review is whether the Commissioner's decision is supported by substantial evidence.

Plaintiff Bonnie Butler protectively filed an application for Disability Insurance Benefits (DIB) in May 2002. (Tr. 50-52). She alleged she had been disabled since April 15, 2001 due to upper and lower extremity impairments, right-hand carpal tunnel syndrome, asthma, sarcoidosis,[1] heartbeat

---

[1] Sarcoidosis is a "systemic granulomatous disease of unknown cause, especially involving the lungs with resulting interstitial fibrosis." *Stedman's Medical Dictionary* 1593 (27th ed. 2000). Granulomas are "nodular inflammatory lesions, usually small or granular, firm, [and] persistent." *Id.* at 768.

irregularities, sleep apnea, and hepatitis. (Tr. 50-52, 65). Plaintiff's claim was initially denied in August 2002. (Tr. 28-32). Plaintiff sought a review hearing before an Administrative Law Judge (ALJ). (Tr. 35). A hearing took place before ALJ Douglas Jones on August 3, 2004. (Tr. 510-62). Plaintiff was represented at the hearing. (Tr. 48-49, 512). The ALJ denied Plaintiff's claims in an opinion issued on September 2, 2004. (Tr. 15-25). The Appeals counsel denied Plaintiff's request for review and the ALJ's decision is now the final decision of the Commissioner. (Tr. 5-14). Plaintiff appealed the denial of her claim to this Court and both parties have filed motions for summary judgment.

### III. **MEDICAL HISTORY**

In 1999 Dr. Stuart Weiner, D.O. treated Plaintiff and referred her for x-rays due to complaints of chest pain. An x-ray taken of Plaintiff's chest in February 1999 suggested an infiltrate in her right middle lung field and some left lung patches. The significance of these results was uncertain. (Tr. 237). Further x-rays were taken in April 1999 which showed a slight improvement in Plaintiff's mild, right lower lobe infiltrates compared to the February x-ray and no new infiltrates were seen. However, generalized lung changes were noted which represented either chronic fibrosis or stable metastatic disease. (Tr. 89). Plaintiff was thereafter referred to Dr. Clark Headrick for further treatment. (Tr. 92).

Plaintiff underwent a bronchoscopy in May 1999 upon Dr. Headrick's recommendation so as to rule out a sarcoid diagnosis. (Tr. 316). An x-ray of Plaintiff's chest post-bronchoscopy showed no evidence of pneumothorax. (Tr. 320). Further x-rays taken later that month remained unchanged from those taken in April 1999. (Tr. 236). Dr. Headrick reported in June 1999 that Plaintiff was feeling better. He noted that Plaintiff's gallium scan was abnormal and she had a minimally abnormal chest x-ray. Plaintiff's bronchoscopy was benign with no evidence of lesions. However, Dr. Headrick suspected that Plaintiff had an infectious process. He therefore recommended a repeat chest x-ray and a possible repeat bronchoscopy. Subsequent chest x-rays showed interstitial and alveolar densities

bilaterally, which had slightly progressed. It was recommended that Plaintiff undergo another bronchoscopy. (Tr. 314).

In August 1999 Plaintiff went to the emergency room complaining of a rapid heartbeat and shortness of breath. Plaintiff was examined and treated with medication. She was diagnosed with acute anxiety and released. (Tr. 95). Another bronchoscopy was performed in August 1999 with results similar to those of May 1999. (Tr. 296, 310). The diagnosis was diffuse interstitial infiltrates. (Tr. 296, 298, 302).

On November 30, 1999 Plaintiff was referred to the emergency room after complaints of chest palpitations and discomfort as well as dullness, numbness, and loss of strength in her upper left extremity and arm. X-rays showed interstitial infiltrates similar to those seen previously. It was noted that this was consistent with her previous diagnosis of stage I sarcoidosis although her recent pulmonary studies were normal. Upon examination, Plaintiff was neurologically intact and there was no evidence of muscle strength loss. (Tr. 102-03). In December 1999 Plaintiff returned to the emergency room with complaints of chest pain that occurred only when she laid on her right side. (Tr. 124-25). It was noted that stress tests were normal as was an EKG. *Id.*

In January 2000 Plaintiff went to the emergency room complaining of chest pain, which was increased with movement and decreased with rest. (Tr. 139-40). Plaintiff denied any shortness of breath, dizziness, diaphoresis, or trauma. Upon examination, Plaintiff was alert and oriented with no focal deficits and she displayed a full range of motion in her extremities. However, Plaintiff did have reproducible chest pain on the anterior chest wall. (Tr. 139). A chest x-ray showed no acute pulmonary disease. *Id.* The diagnosis was acute musculoskeletal chest pain. Plaintiff was given Tylenol #3 for her pain and was discharged. (Tr. 139-40).

Plaintiff returned to the emergency room in August 2000 complaining of elevated blood pressure following an episode of left chest pain. (Tr. 162-63). Plaintiff's blood pressure was mildly elevated. A chest x-ray and an EKG were normal. (Tr. 162). Plaintiff was seen again in the emergency room in October 2000 complaining of an increased heart rate and fatigue. (Tr. 168). Examination findings were normal. *Id.* Plaintiff was diagnosed with acute fatigue. She was treated and released. (Tr. 165-66).

Plaintiff returned to Dr. Headrick in July 2001 with complaints of fatigue, excessive daytime somnolence, and snoring. Dr. Headrick noted that Plaintiff had gained a significant amount of weight over the last few months, which was likely due to prednisone that she was taking. (Tr. 290). Dr. Headrick recommended that Plaintiff undergo a sleep study to rule out the possibility of obstructive sleep apnea and that Plaintiff should undergo a pulmonary function test. He prescribed more prednisone but altered the timing of her dosages. (Tr. 291).

Dr. Headrick also wrote a letter in July 2001 indicating that Plaintiff required work restrictions. Dr. Headrick noted that Plaintiff had sarcoid disease, which was progressing, but that she was doing reasonably well. He also stated that she required medication to control her disease and that her medication, in combination with her asthma medication, caused certain unspecified side effects that could interfere with Plaintiff's "usual level of excellence" at work. (Tr. 289). Dr. Headrick opined that Plaintiff would be best suited for a "desk job, if one were available" but that a job with minimal to no exposure to fumes, film, toxins, or dust would also be suitable. He further noted that a low stress position would be beneficial because of Plaintiff's medications. Dr. Headrick noted in conclusion that Plaintiff should be in a position that was low-paced without exposure to film or dust and that did not require extensive walking or heavy lifting. *Id.*

Plaintiff underwent a sleep study in August 2001. (Tr. 223). The doctor conducting the study concluded that Plaintiff had primary snoring and mild positional hypopneas, which were related to sleeping on her back. *Id.*

A pulmonary function test conducted in September 2001 was normal. (Tr. 287). Dr. Headrick also reported that Plaintiff was doing well clinically although she was having problems in the workplace due to exposure to chemicals. He also noted that Plaintiff was taking less prednisone and that Plaintiff's sarcoid was well-controlled. (Tr. 285). Dr. Headrick stated that he would continue to wean Plaintiff off the prednisone. *Id.* Plaintiff was completely off of the prednisone by November 2001. (Tr. 284). In December 2001 Plaintiff underwent an EMG evaluation for her complaints of pain in her right, lower extremity. The results were normal with no evidence of underlying cervical radiculopathy, plexopathy, mononeuropathy, or myopathy. (Tr. 217). The same month x-rays were taken of Plaintiff's chest. The x-rays showed a favorable change in that there were less interstitital infiltrates compared to prior x-rays. Only minimal interstititial infiltrates in the right lower lobe were noted. (Tr. 281).

Dr. Headrick noted in January 2002 that Plaintiff was "doing okay" but was having a great deal of swelling. Dr. Headrick believed the swelling was related to Plaintiff's use of Celebrex so he advised Plaintiff to discontinue using it. He also noted that Plaintiff was to continue taking no steroids. (Tr. 271). A subsequent pulmonary function test was overall consistent with normal lung functioning. It was noted that Plaintiff's sarcoidosis was fairly stable. (Tr. 274).

In February 2002 Plaintiff was admitted to the emergency room for abdominal pain. (Tr. 211-16). At the time, Plaintiff's motor and sensory functions were intact. She had a full range of motion in her upper and lower extremities and her gait was normal. (Tr. 211). Plaintiff was treated and released in stable condition. (Tr. 212). The same month Dr. Headrick completed a physician's statement regarding Plaintiff's medical condition. (Tr. 268). Dr. Headrick indicated that Plaintiff had sarcoidosis,

sleep apnea, and arythmia and that her primary complaint was dyspnea. He noted that Plaintiff was disabled and could never return to any gainful employment because she could not tolerate heat, fumes, or chemicals because of her sarcoidosis. Dr. Headrick further stated that Plaintiff's prognosis was fair and that she responded well to treatment unless she had such exposure. *Id.* Dr. Headrick also wrote a letter stating that Plaintiff had hyperactive airway disease and was intolerant of exposure to fumes, toxins, and heavy exertion. He stated that Plaintiff's condition had remained unchanged and recommended that Plaintiff's work restrictions be extended for another 6 months. (Tr. 209).

Plaintiff went to the emergency room in April 2002 complaining of right arm pain and numbness. She denied any upper extremity weakness or shortness of breath. An examination showed that Plaintiff had full muscle strength, active flexion and extension, and no weakness. Plaintiff was prescribed medication and discharged. (Tr. 208-09). A subsequent EMG was ordered, which was normal, and there was no evidence of underlying cervical radiculopathy, plexopathy, mononeuropathy, or myopathy. (Tr. 203). A pulmonary function test produced the same results as those from September 2001 and January 2002. (Tr. 262).

In June 2002 Plaintiff saw Dr. Headrick for complaints of swelling in her extremities, which had lasted for several months. Upon examination, Plaintiff had a mild amount of edema in her extremities. Dr. Headrick noted that Plaintiff's swelling might be due to fluid overload but he wanted to rule out deep venous thrombosis. (Tr. 265). A subsequent test was negative for deep venous thrombosis. (Tr. 264). In July 2002 Plaintiff was hospitalized for one day for chest pain with associated left arm and jaw pain and shortness of breath. (Tr. 377-78). Plaintiff had no edema in her extremities at that time. Plaintiff also had good pulses, normal muscle strength, intact reflexes, and a normal gait. (Tr. 377, 179). Dr. Headrick later noted that the etiology of Plaintiff's chest pain was unclear. (Tr. 251). He

recommended that Plaintiff undergo a stress echocardiogram. A subsequent stress echocardiogram was technically limited and showed no obvious wall motion abnormalities. (Tr. 372).

In August 2002 Dr. Russell E. Holmes reviewed Plaintiff's medical records and completed a Physical Residual Functional Capacity ("RFC") form. (Tr. 183-90). Dr. Holmes concluded that Plaintiff had the RFC to: (1) lift/carry 20 pounds occasionally and 10 pounds frequently; (2) sit/stand/walk for about 6 hours in an 8-hour workday; (3) occasionally climb and crouch; and (4) frequently balance, stoop, kneel, and crawl. (Tr. 184-85). Dr. Holmes also found that Plaintiff should avoid concentrated exposure to heat and should avoid even moderate exposure to extreme cold and fumes, odors, dusts, gases, and poor ventilation. (Tr. 187).

In December 2002 Dr. Headrick reported that Plaintiff's sarcoid was reasonably stable. Although Plaintiff still complained of chest discomfort, Dr. Headrick noted that social factors at home likely played a role in this problem. Chest x-rays were normal. (Tr. 248, 250). He diagnosed Plaintiff with sarcoidosis and somatic dysfunction. (Tr. 248).

Dr. Headrick examined Plaintiff in May 2003 and stated that Plaintiff was "doing okay" with her sarcoidosis, which did not appear to be changing. (Tr. 245). In June 2003 a pulmonary function test indicated that Plaintiff had mild restriction airway process combined with obstructive lung disease but the findings were essentially unchanged from previous studies. (Tr. 242).

Plaintiff was admitted to the hospital for two days in October 2003 complaining of chest heaviness, left arm pain, and back pain. (Tr. 391, 400). During this time period, examinations showed that Plaintiff had full motor strength, a normal gait, equal pulses bilaterally, intact motor and sensory functions, and no edema or tenderness. (Tr. 391, 436-37). Plaintiff also had normal cardiovascular and respiratory functioning and clear breathing sounds. *Id.* A stress and wall motion study was performed which showed that Plaintiff had a probable apical thinning of the left ventricle apex, which needed to

be clinically correlated, but no stress induced ischemic and no significant left ventricular wall motion abnormalities. (Tr. 422). A chest x-ray showed some possible increased interstitial changes in the upper lung zones with questionable early pneumonia in the left upper lobe. (Tr. 421). An EKG was normal. (Tr. 392). Plaintiff was released with instructions to follow up with her family doctor in one week and to get regular flu and pneumonia shots. It was also noted that Plaintiff was instructed to follow a low cholesterol diet but that she had no restrictions on her physical activities. (Tr. 400).

In January 2004 Dr. R. Michael Kelly of Sparrow Occupational Health Services performed an examination of Plaintiff and reviewed her medical records. (Tr. 504-07). Upon examination, Dr. Kelly noted that Plaintiff had an abnormal cough but otherwise normal auscultation and percussion, a regular heart rhythm, some crepitation to the knees, and normal vibration, reflexes, and sensations. (Tr. 505). Dr. Kelly reported that his review of Plaintiff's tests and medical records did not provide evidence of a sarcoid reaction although Plaintiff's respiratory condition was consistent with exposure to fumes, smoke, dust, and other particulates. Dr. Kelly noted that Plaintiff's condition did not result in a "great deal of impairment." However, Dr. Kelly recommended that Plaintiff continue using steroid inhalers due to the impairments that were measured by Plaintiff's cardiopulmonary exercise tests. He also suggested that Plaintiff repeat a sleep study because Plaintiff was still symptomatic and there was some evidence of sleep apnea. (Tr. 506-07).

## IV.     HEARING TESTIMONY

### A.     Plaintiff's Testimony

Plaintiff testified that she took various medications for her impairments, which were effective. (Tr. 523). She had an inhaler that she used 3 to 4 times a week for her asthma. Plaintiff also told the ALJ that she took medication for her irregular heartbeat. The first medication caused her heart to beat too quickly so her doctor switched her medication. The new medication helped to

regulate her heartbeat. (Tr. 523-24). Plaintiff also testified that she had been on steroids for about 1 ½ years, which had caused weight gain and other difficulties. (Tr. 531-34). In addition to medication, Plaintiff stated that she slept on two pillows to help her blood circulate and tried to climb stairs, which assisted in her breathing. (Tr. 526, 528). If she felt an oncoming asthma attack, Plaintiff would either lie down or sit and take deep breaths. (Tr. 528-29).

Plaintiff further testified that she had difficulty sleeping at night because she could not sleep on her back or left side for too long. (Tr. 526). She also took 2 naps during the day which lasted for about 30 minutes each. (Tr. 526-27). Plaintiff estimated that she could sit for a couple of hours at a time, stand for about 1 to 2 hours, walk for maybe 30 minutes, and lift no more than 10 pounds. She could climb stairs but it made her tired and she often had to hold onto the railing. (Tr. 527-28). Plaintiff could also push and pull objects such as a vacuum but it took her longer to perform such tasks. (Tr. 531). Plaintiff described her daily energy level as "pretty good" but she had to pace herself. (Tr. 529). She also told the ALJ that she had a valid driver's license and drove 3 to 4 times a week to go to church. (Tr. 521). In July 2004 she had also gone to Arkansas as a passenger in a car and she flew to California in June 2002. (Tr. 521-22). Plaintiff also attended occasional meetings and events for a women's club. (Tr. 525).

### B. Medical Expert's Testimony

Dr. Mary Jo Voelpel testified as a medical expert after reviewing Plaintiff's medical records and listening to Plaintiff's testimony. (Tr. 532-56). Dr. Voelpel testified that in 1999 Plaintiff had been diagnosed with early sarcoidosis and proximal atrial fibrillation. (Tr. 538). Plaintiff's atrial fibrillation was brought under "excellent control" with low doses of medication. *Id.* She also had a history of mild hypertension, which was well-controlled. *Id.* Dr. Voelpel further noted that the record contained complaints of pain, stiffness, fatigue, and arthritis. The etiology behind these

complaints was unclear. There was no evidence of neurologic dysfunction and nerve conduction studies performed in 2002 were normal. *Id.*

Dr. Voelpel also testified that the medical evidence did not support the conclusion that any of Plaintiff's conditions met or equaled a listed impairment. (Tr. 547-49). She further stated that there was no evidence supporting restrictions related to Plaintiff's ability to ambulate, sit, stand, climb, reach, bend, or use vibratory tools. (Tr. 549-51). However, Dr. Voelpel indicated that the evidence did support a restriction against exposure to dust, fumes, and airborne pollutants, extremes in temperatures and humidity, and possibly unprotected heights. (Tr. 549-50).

The ALJ then asked Dr. Voelpel about whether she agreed or disagreed with Dr. Hedrick's 2001 letter indicating that Plaintiff had various limitations. (Tr. 551). Dr. Voelpel testified that there were slight changes in Plaintiff's chest x-ray which could have suggested more limitation in functioning and in not being able to extensively exert herself. However, she noted that the pulmonary function tests did not suggest any significant restrictions. (Tr. 551). Furthermore, Dr. Voepel testified that x-rays had shown that Plaintiff's condition had improved and stabilized between 2001 and 2002. Dr. Voeplel also stated that Plaintiff was still on steroids at the time Dr. Headrick noted his restrictions and that steroids, generally, could cause side effects such as anxiety, irritability, difficulty sleeping, weakness, weight gain, diabetes, and feelings of stress. Nevertheless, Dr. Voepel indicated that there was no evidence in the record that Plaintiff, even when taking steroids, had limitations in her ability to perform mental activities such as concentrating or interacting with other people or that she had additional work-related stressors. (Tr. 552-53).

**C.     Vocational Expert's Testimony**

Stephanie Leech, a rehabilitation counselor, testified as a vocational expert at the

hearing. (Tr. 556-61). The ALJ asked Ms. Leech to testify as to what unskilled jobs might be available for a hypothetical individual of Plaintiff's age, education, and prior work experience who was limited to light work that involved: (1) occasional bending at the knees; (2) occasional climbing stairs or ladders; (3) no exposure to dust, fumes, or other airborne pollutants; and (4) no exposure to extremely hot or cold temperatures. (Tr. 557-58). Ms. Leech testified that such a person could perform various work including 1,000 greeter jobs, 2,000 hostess jobs, 9,000 general office clerk jobs, and 8,500 cashier jobs in the lower peninsula of Michigan. *Id.*

The ALJ then asked Plaintiff to assume that the hypothetical individual was also limited to occasional bending at the waist, occasional kneeling, no crawling, no climbing ladders, and occasional exposure to unprotected heights or dangerous machinery and who could only work in a clean, air-conditioned environment. (Tr. 559). Ms. Leech testified that such an individual could still perform 1,000 greeter jobs, 2,000 hostess jobs, 7,500 general office clerk jobs, and 7,500 cashier jobs. *Id.* Ms. Leech also testified that such an individual could perform various sedentary jobs, including 1,000 information clerk jobs, 10,000 general office clerk jobs, 1,500 surveillance system monitor jobs. (Tr. 559-60).

In response to questioning by Plaintiff's counsel, Ms. Leech testified that work would be precluded for an individual who required a 30-minute to 1 hour break (not during normal break hours) to lie down and rest either every workday or at least 2 to 3 workdays a week. (Tr. 560-61).

**V.     LAW AND ANALYSIS**

    **A.     STANDARD OF REVIEW**

Title 42 U.S.C. § 405(g) gives this Court jurisdiction to review the Commissioner's decisions. Judicial review of those decisions is limited to determining whether her findings are supported by substantial evidence and whether she employed the proper legal standards. *Richardson v. Perales*, 402 U.S.

389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson,* 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)). It is not the function of this court to try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

In determining whether substantial evidence supports the Commissioner's decision, the Court must examine the administrative record as a whole. *Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even where substantial evidence also supports the opposite conclusion and the reviewing court would decide the matter differently. *Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999).

### B. FRAMEWORK OF SOCIAL SECURITY DISABILITY DETERMINATIONS

The Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis. In the first four steps, Plaintiff had to show that:

(1) he was not presently engaged in substantial gainful employment; and

(2) he suffered from a severe impairment; and

(3) the impairment met or was medically equal to a "listed impairment;" or

(4) he did not have the residual functional capacity (RFC) to perform his relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(e); 20 C.F.R. § 416.920(a)-(e). If Plaintiff's impairments prevented him from doing his past work, the Commissioner would, at step five, consider his RFC, age, education and past work experience to determine if he could perform other work. If not, he would be deemed disabled.

20 C.F.R. § 404.1520(f). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391.

C.       **ANALYSIS**

The ALJ determined that Plaintiff had the RFC to perform light work that involved: (1) occasional kneeling, climbing stairs, and exposure to unprotected heights or hazardous machinery; (2) no crawling, climbing ladders, exposure to high humidity, exposure to dust, fumes, or other airborne pollutants, and exposure to very hot/cold temperatures; and (3) no sudden temperature changes. In response to a hypothetical posed by the ALJ which incorporated this RFC finding, the VE provided testimony upon which the ALJ relied to find that Plaintiff was not disabled.

Plaintiff asserts that the ALJ's RFC finding and subsequent hypothetical were inaccurate. Consequently, the VE's testimony does not support the ALJ's non-disability determination. Specifically, Plaintiff asserts that the ALJ's RFC and hypothetical failed to account for Dr. Headrick's July 2001 opinion regarding Plaintiff's functional limitations resulting from her sarcoid disease.

The Commissioner of Social Security generally gives "more weight to opinions from [the claimant's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)." 20 C.F.R. § 404.1527(d)(2). The Commissioner will give the opinion of a treating physician controlling weight, if the opinion is well-supported and not inconsistent with the other substantial evidence. *Id.* When the opinion of the treating physician is not given controlling weight, factors such as the length of the treatment relationship, nature and extent of the treatment relationship, and the supportability of the physician's opinion will be considered in determining how much weight to afford the opinion. *Id.* The regulations also require the ALJ to give "good reasons in our notice of determination or

decision for the weight ... give[n] your treating source's opinion." 20 C.F.R. § 404.1527(d)(2); *see also* SSR 96-5p.

In his written opinion, the ALJ did not discuss the details of Dr. Headrick's July 2001 opinion. However, the ALJ's general references to Dr. Headrick's opinion make it clear that he considered it. Specifically, the ALJ referred to the exhibit containing the opinion and noted Dr. Headrick's statement that Plaintiff was doing reasonably well with her sarcoid disease despite some progression. (Tr. 20). The ALJ also noted that Plaintiff's former employer did not have any jobs available that were consistent with Dr. Headrick's July 2001 restrictions. (Tr. 21). When the ALJ assessed the credibility of Plaintiff's subjective complaints, the ALJ also made the following statement:

> [Claimaint's] allegations are inconsistent with the objective medical evidence of a "reasonably stable" sarcoidosis as reported by Dr. Headrick on December 17, 2002 . . . and the medical opinions contained in Exhibits 14F49, 14F23 and 10F, and the opinions of the medical expert and the DDS medical examiner contained in Exhibit 12, are all generally consistent with the residual functional capacity determined above . . ..

(Tr. 22).

The ALJ determined that, based upon the record as a whole, no period of 12 consecutive months had elapsed during which Plaintiff lacked the RFC to perform a range of light work that involved only occasional kneeling, no crawling, occasional climbing stairs, no climbing ladders, occasional exposure to unprotected heights or hazardous machinery, no exposure to high humidity, no exposure to dust, fumes, or other air borne pollutants, no exposure to very hot or very cold temperatures, and no sudden changes of temperature. *Id.* The exhibits to which the ALJ referred to as being generally consistent with this RFC finding included Dr. Headrick's July 2001 opinion regarding Plaintiff's functional limitations (exhibit 14F49), the restrictions imposed by doctors at Plaintiff's former work place (exhibit 10F), which included "no jobs with direct exposure to smoke,

-14-

dust, [or] mist" and "no line work", and the state agency physician's conclusions. (Tr. 177, 183-90, 289). Although the ALJ referred to exhibit 14F23, the Court assumes that this was a typographical error because that exhibit does not contain any medical opinion evidence. (Tr. 263). The Court presumes that the ALJ meant to refer to exhibit 14F29, which contains Dr. Headrick's extension of his restrictions in February 2002, as this was the same exhibit that the ALJ previously grouped with exhibits 14F49 and 10F. (Tr. 21, 269).

Plaintiff concedes that the ALJ adopted environmental restrictions that were consistent with Dr. Headrick's opinion. As noted by the ALJ, the environmental restrictions were similarly endorsed by all of the other medical sources in the record, including Dr. Voelpel, the state agency physician, and the doctors at Plaintiff's former place of employment. Given these uncontradicted opinions, the ALJ found that environmental restrictions were warranted by the evidence.

Plaintiff argues that the ALJ's error resulted from his failure to adopt, or to explain his reasons for rejecting, Dr. Headrick's opinion that Plaintiff required a "desk job" with low stress and pace and no heavy lifting or extended walking.[2] Plaintiff contends that Dr. Headrick limited Plaintiff to only a "desk job". However, a reading of Dr. Headrick's opinion indicates that he felt either a "desk job" or a job with environmental restrictions would be the most suitable jobs for Plaintiff. Dr. Headrick essentially opined that Plaintiff could not work as an assembler in a factory as she had previously done for GM. (Tr. 65-66). The ALJ noted that inevitably no jobs could be found at GM

---

[2] Plaintiff contends that Dr. Headrick's opinion was tantamount to a finding that Plaintiff was limited to a reduced range of sedentary work and that if Plaintiff were so limited then the Medical-Vocational Guidelines would have directed a finding of "disabled." *See* 20 C.F.R., Pt. 404, Subpt. P, App. 2, Table No. 1, Rule 201.12. However, there is nothing within Dr. Headrick's opinion from which the Court, or the ALJ, could assume that Dr. Headrick had limited Plaintiff to a reduced range of sedentary work as defined by the regulations, especially given the lack of specific, functional limitations entailed within Dr. Headrick's letter that would correspond with such a definition. As such, the Court addresses the specific limitations as they are actually detailed by Dr. Headrick in his July 2001 letter.

to accommodate Dr. Headrick's restrictions. (Tr. 21). Consequently, the ALJ reasonably concluded that his RFC finding, which included the environmental restrictions noted above, was consistent not only with Dr. Headrick's opinion but also with the other medical source opinions contained within the record. Given the consistency, there was no reason for the ALJ to state reasons for rejecting Dr. Headrick's recommendation of a "desk job".[3]

Plaintiff similarly argues that the ALJ improperly ignored Dr. Headrick's restriction against "heavy lifting." However, the ALJ determined that Plaintiff had to the RFC only to engage in light work. Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). It was reasonable for the ALJ to conclude that the weight restrictions applicable to light work were consistent with Dr. Headrick's opinion. Therefore, no error occurred.

Plaintiff's argument that the ALJ improperly rejected Dr. Headrick's opinion that Plaintiff should be restricted to low-stress, low-paced work with no extensive walking is also without merit. The ALJ concluded that no consecutive 12 month period had elapsed in which Plaintiff could not perform a reduced range of light work and that the medical source opinions as a whole were generally consistent with this conclusion. Neither the state agency physician nor the doctors at Plaintiff's former work place found that restrictions related to walking, low-stress, or low-pace were warranted. However, the testimony of Dr. Voelpel was even more probative. When specifically asked whether she agreed with Dr. Headrick's restrictions, Dr. Voelpel noted that there were slight changes on Plaintiff's chest x-rays, consistent with a flare-up of Plaintiff's sarcoid disease, that *could*

---

[3] Furthermore, as Defendant notes, the ALJ owed no special deference to Dr. Headrick's opinion that she should perform a "desk job" because this was not a medical opinion. Rather, it was a vocational opinion, which is an issue reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(e)(2), (e)(3).

*have* supported more exertional limitations and that Plaintiff's steroid medication *could theoretically* cause anxiety, stress, irritability, and difficulty sleeping. However, Dr. Voelpel testified that there was no evidence in the record to support restrictions for ambulating, sitting, standing, bending, climbing, or reaching. (Tr. 549-51). She further stated that there was no evidence that Plaintiff was limited in her ability to perform mental activities such as concentrating or interacting with other people or that she had additional work-related stressors.[4] (Tr. 552-53). Furthermore, drawing from Dr. Voelpel's testimony, the ALJ noted that Plaintiff's sarcoid disease was in remission. (Tr. 21). The improvement and stabilization of Plaintiff's sarcoid disease was evident from Plaintiff's chest x-rays taken in December 2001 and December 2002. (Tr. 21, 248, 252, 281, 538). Enzyme tests from June 2003, which were monitored for sarcoidosis activity, were normal. (Tr. 21, 539).

As discussed by the ALJ, Dr. Headrick's noted in July 2001 that Plaintiff was doing "reasonably well" with her sarcoidosis despite the progression. (Tr. 20-22, 289). In September 2001 Dr. Headrick stated that Plaintiff's sarcoid disease was well-controlled and that she was doing well clinically as long as she was not exposed to environmental pollutants. (Tr. 285). Dr. Headrick reaffirmed that Plaintiff's sarcoidosis was stable in December 2002 and May 2003. (Tr. 245, 248).

The ALJ further noted that pulmonary function studies and stress tests showed no functional limitations as early as November 1999. (Tr. 20, 102-03, 124-25). Moreover, the

---

[4] Plaintiff neither challenge Dr. Voelpel's testimony nor points to any objective evidence in the record that she suffered from limitations in her ability to walk or from mental deficiencies that impeded the pace at which she performed work or that increased her stress in a work environment. The Court also notes that the record consistently shows that Plaintiff did not suffer from any exertional impairments related to her musculoskeletal systems. Indeed, it was noted that Plaintiff had full motor strength, full range of motion, normal gait, intact motor and sensory functioning, full flexion and extension, and normal EMG tests. (Tr. 102-03, 139-40, 179, 203, 208-09. 211, 217, 377, 391, 436-37).

pulmonary function studies and stress tests continued to show normal results after 1999.[5] (Tr. 262, 274, 287, 372, 392, 422, 538-39, 549, 552).

Furthermore, the ALJ noted that Plaintiff's sarcoidosis had been effectively treated by steroids, which had temporarily caused some adverse effects. However, Plaintiff took steroids for less than a year. (Tr. 21). Therefore, even if there had there been evidence of mental impairment caused by steroid use, such effects had not resulted in limitations that would meet the 12-month durational requirements under the regulations. Reading this evidence as a whole, it is clear that the ALJ found that the restrictions imposed by Dr. Headrick related to walking and work-related stress and pace were not credible.

The Court acknowledges that the ALJ could have articulated his rationale with more precision in his written opinion. However, "[n]o purpose would be served by remanding for the ALJ to explicitly address the shortcomings of [the ALJ's] opinion and the evidence and methods underlying it." *Kornecky v. Comm'r of Soc. Sec'y*, 2006 WL 305648, at * 10 (6th Cir. 2006), citing to *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) (citation omitted) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that remand might lead to a different result."). Furthermore, given the lack of lack of objective evidence to support Dr. Headrick's opinions regarding limitations in Plaintiff's ability to walk or to perform anything other than low-stress, low-paced work, any error resulting from the ALJ's failure to be more articulate was harmless. *See Wilson*, 378 F.3d at 547 ("[I]f a treating [physician's] opinion is so patently deficient that the Commissioner could not possibly

---

[5] Plaintiff also denied having any shortness of breath in January 2000 and April 2002 and in October 2003 an examination showed that Plaintiff had normal cardiovascular and respiratory functioning. (Tr. 139, 208-09, 436-37).

credit it, a failure to observe § 1527(d)(2) may not warrant reversal."). Based upon the foregoing, the Court concludes that the ALJ properly rejected certain portions of Dr. Headrick's opinions.

Plaintiff additionally contends that the ALJ erred by relying upon the VE's testimony because it was delivered in response to an inaccurate hypothetical question. Plaintiff asserts that the hypothetical failed to account for Dr. Headrick's limitations as noted above.

A hypothetical question must reflect an individual's limitations. *See Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629 (6th Cir. 2004). However, an ALJ's question need not contain certain talismanic language. Rather, a question will be found sufficient if it encompasses the plaintiff's relevant limitations. *See Chafin v. Comm'r of Soc. Sec.*, 2005 WL 994577, **2, 4 (E.D. Mich. 2005) (hypothetical that limited employment to "simple, unskilled, work" sufficiently accounted for Plaintiff's mental deficiencies). Furthermore, the ALJ need only incorporate into the hypothetical question the physical and mental limitations accepted as credible. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

As stated above, the ALJ's determination regarding the credibility of Dr. Headrick's opinion regarding Plaintiff's functional limitations was supported by substantial evidence. Therefore, the ALJ was not required to incorporate any non-credible limitations into his hypothetical and the ALJ's reliance upon the VE's testimony was appropriate.

## VI. <u>RECOMMENDATION</u>

The Commissioner's decision is supported by substantial evidence. Defendant's Motion for Summary Judgment (Docket # 11) should be **GRANTED**. Plaintiff's Motion for Summary Judgment (Docket # 10) should be **DENIED** and her complaint **DISMISSED**.

## VII. NOTICE TO THE PARTIES

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Willis v. Secretary*, 931 F.2d 390, 401 (6th Cir. 1991). Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: June 21, 2007                             s/ Mona K. Majzoub
                                                 MONA K. MAJZOUB
                                                 UNITED STATES MAGISTRATE JUDGE

## PROOF OF SERVICE

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: June 21, 2007                             s/ Lisa C. Bartlett
                                                 Courtroom Deputy